# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 1, 2011 Session

## STATE OF TENNESSEE v. SHELLY MINOR

**Appeal from the Criminal Court for Shelby County**
**No. 08-06446, 09-07086      Lee V. Coffee, Judge**

---

**No.  W2010-01677-CCA-R3-CD  - Filed July 26, 2012**

---

Appellant, Shelly Minor, was indicted by the Shelby County Grand Jury for several offenses after the death of his estranged girlfriend.  At the conclusion of a lengthy jury trial, Appellant was found guilty of second degree murder, leaving the scene of an accident involving injury or death, driving while a habitual motor vehicle offender, driving under the influence ("DUI"), reckless driving, vehicular homicide by intoxication, and vehicular homicide by reckless conduct.  At sentencing, the trial court merged the vehicular homicide convictions with the second degree murder conviction and merged the reckless driving conviction with the conviction for driving under the influence.  As a result of the convictions, Appellant was ordered to serve an effective sentence of twenty-eight years, eleven months, and twenty-eight days.  A motion for new trial was denied and this appeal followed.  On appeal, Appellant argues that: (1) the evidence was sufficient to support the convictions; (2) the trial court erred in denying a continuance; (3) the trial court erred in allowing the State to introduce evidence of prior bad acts of Appellant and hearsay statements made by the victim; (4) the State committed discovery violations with regard to recorded telephone calls made by Appellant while incarcerated; (5) cumulative errors necessitate a reversal of Appellant's convictions; and (6) the trial court erred in sentencing Appellant to an excessive sentence with consecutive sentencing.  After a review of the record and applicable authorities, we determine: (1) the evidence was sufficient to support the convictions; (2) Appellant failed to show what the testimony of the missing witness would have been at trial and, therefore, cannot show prejudice from the trial court's failure to grant a continuance to secure the witness's attendance at trial; (3) the trial court properly allowed the State to introduce evidence of prior bad acts of Appellant under Tennessee Rule of Evidence 404(b) and 804(b)(6); (4) Appellant failed to show how he was prejudiced by the State's alleged discovery violations; (5) cumulative errors do not necessitate a reversal of Appellant's convictions; and (6) the trial court properly sentenced Appellant. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Shelly Minor.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

Appellant and Lavatrice Street, the victim, were in a tumultuous relationship. Mrs. Street was married to Freddie Street, but the couple had been separated for ten to fifteen years at the time of the victim's death. Appellant and the victim lived together at the victim's home from 2000 to November of 2007. According to friends and family members, the victim got tired of supporting Appellant and told him to leave. Appellant refused to leave the residence. After he was told to leave, Appellant engaged in various abusive and violent behaviors directed at the victim ultimately culminating with the victim's death in January of 2008.

The police were called to the victim's home on December 4, 2007, after Appellant broke the victim's cell phone and grabbed her by the neck. Appellant threatened to beat her up or "do something" to her if she called the police. Appellant even intentionally inflicted knife wounds on himself and tried to blame it on the victim. When the police arrived, Appellant appeared to have been drinking. Police found a broken cell phone. The victim had urinated in her clothing out of fear of Appellant. Police found the wet clothing in the house. During the police investigation, Appellant admitted that he inflicted cuts on himself and tried to blame it on the victim. Appellant was instructed by police to move his things out of the house. From that point on, Appellant did not live with the victim.

After Appellant moved out, he engaged in a series of acts of vandalism directed toward the victim. On December 5, 2007, there was a burglary call placed from the victim's home. The back window was broken, and there was blood on the door knob. The home was ransacked. The tags from the victim's vehicle were stolen. Appellant was responsible. That

same day, he chased the victim with a drill, threatening to kill the victim. She was so frightened that she again urinated in her clothing.

Appellant slashed tires and drilled holes in the tires of cars belonging to the victim and two of her daughters. The victim had to buy and replace at least five sets of tires for her own vehicle due to Appellant's actions.

On December 9, 2007, Appellant came to the victim's home and banged on the door. When there was no answer, Appellant cut the tires on the victim's car, cut the air conditioning and cable lines to the house, and broke a window. The victim saw Appellant cut the tires and drain fluid from her car before going to the back of the home. The victim replaced the tires that day. A second vandalism call was placed after the victim's tires were slashed for the second time that same day. On December 10, 2007, the victim's tires were slashed again. The cuts were similar to the cuts in the tires made by Appellant on previous occasions.

On December 11, 2007, the victim's home burned to the ground. The victim's daughters claimed that the victim was afraid to rebuild the home because she did not want Appellant to know where she lived.[1]

After her house burned to the ground, the victim moved in with her daughter, Knoishia Cunningham, and took a leave of absence from work, effective December 10, 2007, through January 3, 2008. The victim returned to work on January 2.

On December 16, 2007, the police were called when Appellant discovered two bullet holes in his vehicle, a Volkswagen. Appellant claimed that the victim was responsible. At that time, police ran the tags on Appellant's car and learned that they were actually the victim's stolen tags.

The victim swore out a warrant against Appellant for the events on December 10. She also referenced the events that took place on December 9 and 10 and filed for an order of protection. The victim did not appear at the hearing on the order of protection, so it was dismissed.

---

[1]Prior to trial, the trial court determined that even though Appellant was a suspect there was no concrete evidence to suggest that Appellant was involved in the fire at the victim's residence. Therefore, no evidence with regard to Appellant's involvement with the fire at the victim's home was admissible.

On December 24, 2007, Ms. Cunningham's tires were slashed while she was at work.

On January 16, 2008, the victim filed a theft report after the driver's side window was broken out of her Toyota 4Runner.[2] The victim's checkbook, a cell phone, and some credit cards were stolen.

The next day, security cameras from the victim's place of employment showed a Volkswagen vehicle entering the parking lot at shift change. Appellant drove a dark-colored Volkswagen. The Volkswagen followed a silver SUV out of the parking lot. A short time later, around 7:00 a.m. on January 17, a 911 call was placed from the victim's cell phone. The operator heard a scream before hearing nothing but noise like a television or a radio.

Shortly thereafter, officers witnessed a black Volkswagen with front end damage sitting on the side of Hacks Cross Road near Memphis. Appellant was standing next to the car. The victim's Toyota 4Runner was down the street about two tenths of a mile from Appellant's vehicle, on its side. It appeared that the 4Runner had traveled off the road into a utility pole. The victim was pinned under the vehicle with her head and upper torso visible. The victim was removed from the vehicle and transported to the hospital where she died of blunt force trauma.

Appellant walked away from the scene, walking all the way to his mother's house to change out of "muddy" clothing. A beer can was found in Appellant's vehicle. A Bible and document entitled "Dismissal of Order of Protection" were found in the victim's vehicle.

Appellant was arrested shortly thereafter. He was indicted in September of 2008 by the Shelby County Grand Jury on charges of first degree murder, leaving the scene of an accident resulting in death, driving while being declared a habitual motor vehicle offender, driving under the influence, and reckless driving. In September of 2009, a separate indictment was issued charging Appellant with vehicular homicide by intoxication and vehicular homicide by reckless conduct.

While Appellant was incarcerated prior to trial, he called his mother from jail. During that telephone call, Appellant told his mother that it was not his intent to kill the victim. He told his mother that the victim saw him driving behind her and rammed her vehicle into his vehicle. Appellant also wondered why there was no arrest warrant for him if he were responsible for slashing the victim's tires.

---

[2]Prior to trial, the trial court determined that there was no evidence to suggest that the victim was involved in the vehicle burglary that occurred on January 16.

At trial, an expert for the State opined that both vehicles were traveling in the same direction when Appellant's vehicle hit the back of the victim's vehicle. It appeared both from the lack of mud on the right side of Appellant's vehicle and the mud present on the left side of Appellant's vehicle, that Appellant's vehicle was close to the right side of the victim's vehicle as the victim's vehicle went off the road. In other words, the victim's car left the road after being struck by Appellant's car.

Appellant hired his own accident reconstructionist, Ralph Cunningham, to testify at trial. He agreed that Appellant's vehicle struck the victim's vehicle while both traveled in the northbound lane. He guessed that Appellant's vehicle was going approximately twenty-two miles per hour faster than the victim's vehicle at impact. Based on the markings on the road and position of the vehicle, he opined that the crash was caused by inappropriate steering input. Mr. Cunningham also opined that the victim hit the utility pole at a speed of twenty-four to thirty miles per hour before traveling another fifty feet as it rotated and flipped. Mr. Cunningham was of the opinion that the victim would have survived the crash if she had been wearing a seatbelt. He based this opinion on his personal experience of witnessing crash tests with crash test drivers.

At the conclusion of the evidence, the trial court instructed the jury to use the proof of prior bad acts by Appellant for purposes of intent or motive, not propensity. The jury found Appellant guilty of second degree murder, leaving the scene of an accident involving injury or death, driving under the influence, driving while being declared a habitual motor vehicle offender, reckless driving, vehicular homicide by intoxication, and vehicular homicide by reckless conduct.

The trial court held a separate sentencing hearing. At that hearing, the trial court noted Appellant's lengthy criminal history, including one prior felony. Appellant was sentenced to twenty-five years for second degree murder, eleven months and twenty-nine days for leaving the scene of an accident, two years for driving while being a habitual motor vehicle offender, eleven months and twenty-nine days for the DUI conviction, and six months for reckless driving. The trial court merged the reckless driving conviction with the DUI conviction. The trial court imposed a twelve-year sentence for the conviction for vehicular homicide by intoxication and six years for vehicular homicide by reckless conduct and merged both of those convictions into the second degree murder conviction. The trial court further found that Appellant was a dangerous offender with no hesitation about committing a crime in which the risk to human life was high. As a result, the trial court ordered the sentences to run consecutively to each other for a total effective sentence of twenty-eight years, eleven months, and twenty-eight days.

Appellant filed a motion for new trial. The motion was denied. On appeal, Appellant insists that: (1) the trial court erred by denying a continuance; (2) the trial court erred by admitting evidence of Appellant's prior bad acts; (3) the State violated discovery; (4) the evidence was insufficient; (5) the cumulative errors deprived Appellant of a fair trial; and (6) the trial court improperly sentenced Appellant.

*Analysis*

*Denial of Continuance*

On appeal, Appellant argues that the trial court erred in denying a continuance. Specifically, Appellant argues that he was prejudiced at trial because Kelly Gilliam, the only eyewitness to the accident, was in school out of state and was unable to attend the trial because of exams. Appellant argues on appeal that the trial court's denial of the continuance "irreparably harmed" Appellant because Ms. Gilliam's testimony would have corroborated Appellant's theory of the case. The State argues that the record shows Ms. Gilliam discontinued contact with the State and Appellant prior to trial and did not indicate that she was willing to testify. Additionally, the State points out that Appellant could have compelled Ms. Gilliam to testify and chose not to pursue this option. Lastly, the State insists that there is not an accurate proffer in the record to show the substance of the proposed testimony. Therefore, Appellant did not show prejudice, and the trial court did not abuse its discretion.

Appellant filed a motion for a continuance prior to trial; the State opposed the motion even though they had also subpoenaed Ms. Gilliam as a witness. The trial court denied the motion. Appellant filed a motion to reconsider, even making an offer of proof as to Ms. Gilliam's expected testimony. The offer of proof came in the form of statements by counsel for Appellant as to what Ms. Gilliam's testimony would have been had she testified at trial.

The granting of a continuance rests within the sound discretion of the trial court. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. *Id.* Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. *Odom*, 137 S.W.3d at 589.

In the case herein, Appellant filed the motion for continuance ten days prior to trial on April 15, 2010. The motion was accompanied by an affidavit, which stated that Ms.

Gilliam was preparing for exams at an out-of-state school. It indicated that a subpoena had been issued but not yet served. The affidavit indicated that Ms. Gilliam was served with a subpoena for an earlier trial date prior to a different continuance. Ms. Gilliam contacted Appellant's investigator on April 12, 2010, and informed her of the conflict with exams.

During the hearing on the motion, the trial court noted that the case had been pending for nearly three years, during which time Appellant had made multiple requests for speedy trial. The trial court also noted that both Appellant and the State requested the most recent continuance six months earlier to conduct more thorough scientific investigation into the accident. When the continuance was granted, the trial court cautioned the parties that they had to be ready for trial in April. At the conclusion of the hearing, the trial court denied the motion but noted that Appellant could force service of subpoena on Ms. Gilliam.

On April 19, 2010, Appellant filed a motion to reconsider the denial of the motion and a motion to accept a proffer. The trial court held a hearing on the motion on the morning of jury selection. Appellant did not present an affidavit of Ms. Gilliam at this hearing but merely related what Ms. Gilliam's testimony would likely be if she were available at trial. The trial court again denied the motion, finding that Ms. Gilliam's testimony, as presented by counsel for Appellant, would be that she saw two vehicles swerving and could not explain why. The trial court also noted that the jury was sequestered and available on a Saturday, allowing Ms. Gilliam the opportunity to testify on a day that she would not have an exam. The trial court specifically noted that Appellant had six months to contact Ms. Gilliam and had waited until shortly before the trial date.

At the close of proof, the State informed the trial court that Ms. Gilliam had not returned any messages. Appellant likewise agreed that they had not been contacted by Ms. Gilliam.

During the hearing on the motion for new trial, Appellant did not present Ms. Gilliam as a witness or produce an affidavit of what her testimony would have been at trial. The trial court denied relief on this issue.

Appellant is not entitled to relief. Appellant offered statements as to the potential testimony by counsel at trial rather than an affidavit or live testimony from Ms. Gilliam. *Alley v. State*, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994). It is well-settled that statements of counsel are not evidence. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) (holding that statements of counsel during the course of a hearing are not evidence). No evidence of Ms. Gilliam's likely testimony was offered at the new trial hearing. Appellant had ample opportunity after trial to secure an affidavit from Ms. Gilliam about what she saw on the day of the accident or subpoena Ms. Gilliam to ensure her

appearance. Appellant failed to do so. Appellant cannot now complain about his failure to take action at the trial level. *See* Tenn. R. App. P. 36(a) (stating that relief need not be granted "to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, we cannot find that the trial court abused its discretion in denying the continuance. Appellant is not entitled to relief on this issue.

## *Evidentiary Rulings*

Next, Appellant claims that the trial court improperly allowed "the State to present testimony from several witnesses recounting numerous bad acts committed by [Appellant] against [the victim]." Specifically, Appellant argues that the evidence was unfairly prejudicial and should not have been admitted under Tennessee Rule of Evidence 404(b). Appellant also argues that hearsay statements of the victim should not have been admitted under the forfeiture by wrongdoing provision of Tennessee Rule of Evidence 804(b)(6). In other words, Appellant insists that the trial court abused its discretion with regard to the evidence that was admitted at trial. The State, on the other hand, argues that the trial court did not abuse its discretion and, in any event, the jury's verdict of the lesser included offense of second degree murder "affirmatively shows that their verdict was the product of their consideration of the evidence and precludes any finding that they were prejudicially swayed by the evidence."

### *A. 404(b) Evidence of Prior Bad Acts*

Prior to trial, Appellant filed a motion in limine seeking to limit the State's introduction of evidence of prior bad acts committed by Appellant. The State properly filed a notice of intent to use evidence of prior bad acts pursuant to Tennessee Rule of Evidence 404(b). The trial court held a lengthy hearing on the motion.

At the hearing on the motion in limine, the trial court heard testimony from several witnesses, including Ms. Cunningham, one of the victim's daughters. Ms. Cunningham recounted several instances during which she was talking to the victim on the phone. During these conversations, she could hear Appellant in the background questioning who the victim was talking to on the phone. On several occasions, Ms. Cunningham heard Appellant question the victim just prior to the line going dead. On one particular occasion she saw a broken cell phone when she went to the victim's house. The victim reported to Ms. Cunningham that Appellant had broken at least five phones.

Ms. Cunningham testified that after the December 4 incident during which Appellant inflicted cuts on himself, the victim was very scared because if Appellant "was crazy enough

to cut himself up, she didn't know what he would do to her." The victim was "scared" and "shaking." Ms. Cunningham recalled several incidents during which Appellant cut the tires on her car, the victim's car, and her sister's car. The victim had to buy new tires on at least five occasions. Ms. Cunningham even witnessed Appellant cutting tires on one occasion.

Ms. Cunningham had seen Appellant push and shove the victim and talked to the victim on the phone on the day that Appellant chased her with a drill. Ms. Cunningham was with the victim when she sought the order of protection. She recalled the victim's being afraid that Appellant would kill her at some point. The trial court ruled that all of Ms. Cunningham's testimony was admissible under both 404(b) or 804(b)(6).

Lakisha Coleman, the victim's daughter, corroborated the testimony of Ms. Cunningham. Ms. Coleman also testified that she was present when Appellant inflicted cuts on himself in an attempt to have the victim arrested. Ms. Coleman testified that she thought Appellant was responsible for the fire that burned down the victim's home. The trial court determined that there was no evidence that Appellant had anything to do with the fire and excluded that testimony but deemed the remainder of Ms. Coleman's testimony admissible.

Freddie Street, the victim's estranged husband, testified that the victim was "scared" and "ticked off" that Appellant kept cutting her tires. He knew the victim was scared for her life. Sometimes the victim even parked her car at Mr. Street's house so that Appellant did not know where it was parked. The trial court ruled that Mr. Street's testimony was admissible.

Mandy White, a friend of the victim, testified at the hearing that she had phone conversations with the victim similar in nature to those described by Ms. Cunningham. Ms. White could hear Appellant criticizing the victim in the background prior to the phone line going dead. Ms. White testified that the victim had a swollen face and a bruise on her back between late November and Christmas of 2007. The victim told her that she "got into it" with Appellant. Ms. White thought that the victim was afraid of Appellant and feared for her life. The trial court ruled that all of Ms. White's testimony was admissible.

Deputy Ricky Pollard testified at the hearing. He responded to the 911 call on December 4, 2007. He knew the victim because he had seen her before at the BP station near her home. When Deputy Pollard met the victim that night she was "scared, frantic." The victim stated that Appellant threatened to "do something to her" if she called police. The trial court found that this testimony supported the conclusion that Appellant had threatened the victim with violence if she decided to prosecute.

The trial court ruled that Deputy Ezra Miller's testimony about the burglary call on December 5, 2007, was admissible as well as testimony from Officer Sean Tucker about the bullet holes found in the Appellant's car on December 16, 2007.

The trial court also determined that testimony from Deputy Richard Phillips and Detective Brian Beck was admissible. They testified about the vandalism of the victim's home on two different occasions on December 9.

The trial court also heard the testimony of Deputy Robert Butterick about the fire at the victim's home on December 11, 2007. He testified that they were not able to determine the source of the fire but believed it was deliberately set. Appellant was a suspect, but there was no proof of his involvement. The trial court excluded this testimony.

At the conclusion of the hearing, the trial court ruled that the prior bad acts and threats against the victim were admissible to show malice and intent to harm.

The Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *See State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a

hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

Appellant argues on appeal that the evidence the State sought to introduce and did ultimately introduce at trial only served as propensity evidence. We disagree. The State sought to use the evidence of Appellant's prior assaults and the nature of the relationship between Appellant and the victim to prove premeditation, motive, and intent. In *State v. Gilley*, 297 S.W.3d 739 (Tenn. Crim. App. 2008), this Court examined the admissibility of prior threats of violence in a case with a similar set of facts. In *Gilley*, the victim and defendant were in a relationship in which at least six witnesses offered testimony that the defendant had, on prior occasions, been violent toward the victim. *Id.* at 745. Specifically, this Court noted:

> Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); *see also State v. Turnbill*, 640 S.W.2d 40, 46–47 (Tenn. Crim. App. 1982). The courts theorize that such evidence is probative of the defendant's mens rea at the time of the homicide because it reveals a "settled purpose" to harm the victim. *Smith*, 868 S.W.2d at 574. Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Id.*

> The defendant argues that the only purpose for introducing evidence of his assaults against the victim was to show a propensity for harming the victim. We agree with the defendant that evidence is admissible pursuant to Rule 404(b) only when it is probative of a material issue at trial. *See generally Bunch v. State*, 605 S.W.2d 227, 229-32 (Tenn. 1980). Here, the defendant was indicted for first degree premeditated murder, and the State's theory was that the murder was accomplished by driving the victim to a remote location, assaulting her with a blunt object, and then later moving her body to another location. The State was obliged to prove that the killing of the victim was "premeditated and intentional." *See* T.C.A. § 39-13-202(a)(1) (1982). In our view, evidence of the defendant's prior assaults of the victim fits squarely

within the *Smith* rule. The evidence established the violent nature of their relationship and the defendant's hostility toward the victim.

297 S.W.2d at 758.

In the case herein, we conclude that evidence of Appellant's prior violent behavior toward the victim was probative of Appellant's intent. Appellant was seen and heard on multiple occasions both by the victim's friends and relatives and by the police as displaying violent, abusive behavior toward the victim. Although the evidence was no doubt damaging to Appellant, based on our review of the facts presented in this case, we hold that the probity of the evidence outweighs any prejudice. Moreover, the trial court gave the jury a limiting instruction so as to facilitate their understanding and application of the Rule 404(b) evidence. *See State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003) (stating that jurors are presumed to follow the instructions given them absent evidence to the contrary). We conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, the evidence was properly admitted, and Appellant is not entitled to relief.

### B. Statements of the Victim under 804(b)(6)

Along with the motion filed to admit prior bad acts of Appellant under Tennessee Rule of Evidence 404, the State filed a motion to admit statements of the victim pursuant to Tennessee Rule of Evidence 804(b)(6). This rule of evidence allows the admission of hearsay statements "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." *Id.* Appellant opposed this motion.

In *State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006), the court determined that the following principles apply to the application of the so-called forfeiture by wrongdoing exception: (1) the rule does not limit the subject matter of the statements; (2) the rule is not limited to statements made when a formal charge or judicial proceeding is pending against the defendant; (3) the trial court must conduct a jury-out hearing to determine whether statements are admissible; (4) the trial court must find that a preponderance of the evidence establishes "that the defendant was involved in or responsible for procuring the unavailability of the declarant"; and (5) the trial court must find that a preponderance of the evidence establishes "that a defendant's actions were intended, at least in part, to procure the absence of the declarant." 188 S.W.3d at 147. This exception does not contradict with a defendant's rights under the Confrontation Clause. *Id.*; *see also Giles v. California*, 554 U.S. 353 (2008). In *Giles*, the Supreme Court of the United States explained:

The domestic-violence context is, however, relevant for a separate reason. Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution-rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Id.* at 377.

In the case herein, at the conclusion of the lengthy hearing, the trial court determined that the victim's statements relating to Appellant's prior bad acts were admissible under 804(b)(6). The trial court further determined that Appellant was motivated to kill the victim in an attempt to keep her from being able to testify in court about Appellant's acts of vandalism, domestic abuse, and harassment. Specifically, the trial court noted:

All of these statements are statements which, obviously, [Appellant] cannot cross-examine, but they do go to show that this [Appellant] was committing these acts, breaking cell phones, imprisoning this victim in her own home to separate her not only from family members and any outside help, but to separate her and isolate her from the Police Department and threatening that he would, in fact, hurt her, he would kill her, if any of these acts were, in fact, reported to the Police Department or to appropriate authorities.

. . . .

[T]he court does find [these statements made by the victim] are an exception to hearsay and that those statements were, obviously, directly designed to prevent this victim from showing up in Court, from reporting his conduct, because, obviously, if he was threatening to beat her up, kill her, if she called police, that would apply, is trying to prevent her not only from reporting this conduct, but from testifying against him . . . .

The record supports the conclusion of the trial court. The victim's death came on the heels of a long series of events of domestic violence and vandalism. The victim tried

-13-

repeatedly to get help from the police, by reporting Appellant's actions. Statements made by the victim to others indicated that Appellant threatened the victim for talking to other people on the phone, threatened to "do something to her" if she contacted police, and even cut himself in an attempt to make it look like the victim had committed assault.

While Appellant argues that only the December 4 and 5 events[3] were intended to dissuade the victim from testifying and are the only statements of the victim that are eligible for admissibility under the forfeiture by wrongdoing exception to the hearsay rule, we disagree. As noted in *Giles*, all prior acts of domestic violence leading up to the death of the victim are relevant. *Id.* The trial court followed the procedure set forth in *Ivy* and concluded that Appellant killed the victim at least in part to prevent her from testifying about his other crimes against her. 188 S.W.3d at 147. As noted above, the subject matter of the statements is not limited by the rule, and the statements do not have to relate to formal charges or judicial proceedings pending against the defendant. *Id.* In this case, the trial court properly conducted a hearing to determine whether statements were admissible and found that a preponderance of the evidence established "that the defendant was involved in or responsible for procuring the unavailability of the declarant"; and "that a defendant's actions were intended, at least in part, to procure the absence of the declarant." *Id.* The trial court specifically noted that the acts by Appellant were "done at least in part to make sure that [the victim] would not appear in Court as a witness." The evidence does not preponderate against the findings of the trial court; Appellant is not entitled to relief.

*Discovery Violation*

Appellant asserts on appeal that the State committed a discovery violation by failing to provide the defense with a recorded telephone call made by Appellant to his mother from the jail until the Friday before trial began. Appellant insists that the State violated Tennessee Rule of Evidence 16(a)(1)(B) and, as a result, his ability to prepare for trial was affected. The State, on the other hand, insists that once they were given the recordings they "immediately complied with [ ] discovery . . . and provided copies to [Appellant]."

As noted previously, the tapes at issue included a telephone call made by Appellant to his mother from the jail. During the conversation, Appellant says that he did not intend to kill the victim because he would not have done it on Hacks Cross Road. Appellant states that the victim saw him behind her on the road and that the victim rammed her vehicle into

---

[3]The December 4 event was where Appellant cut himself and threatened to "do something" to the victim if she went to the police. The December 5 event involved Appellant chasing the victim with a drill while threatening to kill the victim.

his vehicle. Appellant also asks his mother why there was no warrant issued for his arrest if he were responsible for slashing the victim's tires.

Tennessee Rule of Evidence 16(a)(1)(B) provides that the State is to disclose the following evidence:

Upon a defendant's request, the state shall disclose and made available for inspection, copying, or photographing, all of the following:

(i)     the defendant's relevant written or recorded statement, or copies thereof, of:

(I)     the statement is within the state's possession, custody, or control; and

(II)     the district attorney general knows-or through due diligence could know-that the item exists; and

If a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2)(A)-(D). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). When arguing that the State violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 530, 548 (Tenn. 1992). However, evidence should only be excluded when it is shown that the party is actually prejudiced by the failure to comply with discovery and the prejudice cannot otherwise be eliminated. *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993); *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984).

At the outset, we note that Appellant risks waiver of this issue because he did not request a continuance when the recordings were discovered. *See* Tenn. R. App. P. 36(a); *State v. Robert Frost*, No W2001-00818-CCA-R3, 2003 WL 21339225, at *5 (Tenn. Crim. App., at Jackson, May 16, 2003). Further, the tapes at issue were not included in the record on appeal. It is well-settled that it is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis for the appeal. Tenn. R. App. P. 24(b); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000); *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). In the absence of an adequate record, this Court must presume the correctness of the trial court's ruling. *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991). Finally, even if this Court determined that the State violated discovery rules, Appellant has failed to show prejudice as a result of the State's actions. He merely makes

a conclusory allegation that the alleged violation "affected his ability to prepare for trial." Appellant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Appellant argues that the evidence is insufficient. He challenges his convictions for second degree murder, DUI, and vehicular homicide by intoxication. Specifically, Appellant argues that the testimony at trial did not support the conclusion that Appellant was "reasonably certain that the accident would have been reasonably certain to cause [the victim's] death" and that the evidence did not support the fact that he was intoxicated at the time of the accident. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A. Second Degree Murder

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. T.C.A. §§ 39-13-201,-210(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence. *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). Because second degree murder is a "result-of-conduct" offense, a defendant is guilty if he "acts intentionally, meaning that he acted with a conscious objective or desire to cause the death of the alleged victim." *State v. Page*, 81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002). The determination of whether a defendant acted "knowingly" is a question of fact for the jury. *Inlow*, 52 S.W.3d at 104-05. Intent can be determined from the circumstances of the case. *Id.* at 105.

Viewing the evidence in a light most favorable to the State, the jury could have concluded that Appellant knew his actions were reasonably certain to cause the victim's death. The State's expert opined that Appellant rammed his vehicle into the back of the victim's vehicle from behind and that Appellant's vehicle was going much faster than the victim's vehicle at the time of the collision. The expert concluded that the "velocity" with which Appellant's vehicle struck the victim's vehicle caused the victim's vehicle to shift and ultimately caused it to spin around after hitting and breaking the utility pole. Given the nature of the victim's death and the testimony given at trial, a reasonable jury could conclude Appellant was guilty of a knowing killing. Moreover, given Appellant's prior statements that he would kill the victim if she went to police and his acts of violence and vandalism against her, a jury could have reasonably concluded Appellant "intended" to kill the victim. The mental state of "intent" on part of a criminal defendant suffices to establish a mental state of knowing. T.C.A. § 39-11-301 (a)(2).

In a related argument, Appellant claims that the verdict was inconsistent where the jury convicted him of second degree murder and leaving the scene of an accident involving injury or death. Appellant opines that when the jury found him guilty of the lesser included offense of leaving the scene of an accident involving injury or death rather than leaving the scene of an accident resulting in death, the jury "flatly rejected this notion that [Appellant] knew or reasonably should have known that [the victim's] death resulted from the accident." We disagree. Each count of an indictment is regarded as a separate offense. *See Wiggins v. State*, 498 S.W.2d 92 (Tenn. 1973). Moreover, "[c]ourts have always resisted inquiring into a jury's thought processes." *United States v. Powell*, 469 U.S. 57, 67 (1984). This resistance is perhaps best illustrated in the cases, like the one herein, involving a defendant's challenge

to the consistency of a jury's verdicts in a multi-count indictment. After *Wiggins*, this Court has consistently declined to disturb one conviction on the basis that the jury's acquittal on another offense is inconsistent, even when the elements and evidence of the two offenses intertwine or are the same. *See State v. Derek T. Payne*, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813 (Tenn. Crim. App., Jackson, Nov. 20, 2002) (upholding conviction of second degree murder as a lesser included offense of felony murder even when convicted of underlying felony). Appellant is not entitled to relief on this issue.

### B. *Vehicular Homicide by Intoxication*/DUI

Vehicular homicide by intoxication is the reckless killing of another by the operation of an automobile as the proximate result of the driver's intoxication as set forth in Tennessee Code Annotated section 55-10-401. *See* T.C.A. § 39-13-213(a)(2). Tennessee Code Annotated section 55-10-401(a)(1) makes it illegal for any person to drive or be in physical control of any automobile while "[u]nder the influence of any intoxicant, marijuana, controlled substance, drug substance affecting the central nervous system or combination thereof that impairs the driver's clearness of mind and control of himself which he would otherwise possess."[4] The statute setting out DUI is found at Tennessee Code Annotated section 55-10-401 which provides:

(a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

(1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or

(2) The alcohol concentration in such person's blood or breath is eight-hundredths of one percent (.08%) or more.

Viewing the evidence in a light most favorable to the State, Appellant's blood alcohol level was .13 percent when taken at 3:00 p.m. on the day of the accident. The accident resulting in the victim's death involved Appellant's car and occurred around 7:30 a.m. and Appellant was arrested around 10:00 a.m. There was at least one beer can recovered from Appellant's vehicle. The testimony at trial showed that Appellant left the scene of the

---

[4]This statute was amended effective January 1, 2011. The amendments do not apply in the case herein.

-18-

accident and walked to his mother's home through a muddy field, arriving around 9:30 a.m. The distance between the crash scene and Appellant's mother's home was not clear from the record. Once at his mother's home, Appellant went straight to his bedroom to change his clothing. There was no proof that Appellant was consuming alcohol or in possession of alcohol once he arrived at his mother's house. An officer showed up at Appellant's mother's home around 10:00 a.m. and took Appellant into custody. The officer testified that he did not smell alcohol on Appellant's person when he was taken into custody. However, Appellant's blood alcohol level was still .13 percent at 3:00 p.m. Appellant argues that it is possible that he became intoxicated after the accident but before he was taken into custody. Given the timeline, the jury would have had to conclude that Appellant left the scene of the accident around 7:30 a.m., trudged through a muddy field, stopped to buy alcohol, and consumed the alcohol prior to arriving at his mother's home around 9:30 a.m. The jury clearly discredited this theory. The evidence was sufficient for a reasonable jury to conclude that Appellant consumed alcohol, was driving, and was intoxicated prior to the victim's death. Appellant is not entitled to relief.

*Sentencing*

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, a trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses, (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). When imposing the sentence within the appropriate sentencing range for the defendant:

[T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2006).

At the outset we note that Appellant committed the criminal offenses at issue in January of 2008; therefore, the 2005 amendments to the Sentencing Act apply to our review of his sentencing. The 2005 amendments to the Sentencing Act made the application of the enhancement factors advisory in nature. *See* T.C.A. § 40-35-114; *State v. Jackie Lynn Gray*, No. M2007-02360-CCA-R3-CD, 2008 WL 2579175, at *5 (Tenn. Crim. App., at Nashville, June 28, 2008), *perm. app. denied*, (Tenn. Dec. 29, 2008); *State v. Troy Sollis*, No. W2007-00688-CCA-R3-CD, 2008 WL 1931688, at *3 (Tenn. Crim. App., at Jackson, May, 2, 2008). In fact, "[T]he 2005 amendments [to the Sentencing Act] deleted as ground for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008).

In the case herein, Appellant was charged with multiple offenses in two separate indictments. After the jury trial, he was convicted of second degree murder, leaving the scene of an accident involving injury or death, DUI, violation of a habitual motor vehicle offender order, vehicular homicide by intoxication, and reckless driving.

After a review of the transcript from the sentencing hearing, it is clear that the trial court considered the nature and characteristics of the criminal conduct involved, Appellant's history and background, the mitigating and enhancement factors, and the principles of sentencing. *See id.* at 345-46. The presentence report indicated that Appellant had a long history of criminal convictions including aggravated criminal trespass, vandalism, assault, receiving stolen property, a weapons offense, and numerous convictions for driving on a revoked license. The trial court applied two enhancement factors: (1) that Appellant had a long history of criminal convictions and criminal behavior, beginning in 1988; and (2) the risk to human life was high. The record supports the existence of each applied enhancement factor. With regard to consecutive sentencing, the trial court found that Appellant was a

dangerous offender with no hesitation about committing a crime in which the risk to human life was high. In other words, the trial court made the required findings, on the record, to support consecutive sentencing as required by *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). As a result of the findings, the trial court sentenced Appellant to twenty-five years for second degree murder, eleven months and twenty-nine days for leaving the scene of an accident, two years for driving while being an habitual motor vehicle offender, eleven months and twenty-nine days for the DUI conviction, and six months for reckless driving. The trial court merged the reckless driving conviction with the DUI conviction. The trial court imposed a twelve-year sentence for the conviction for vehicular homicide by intoxication and six years for vehicular homicide by reckless conduct and merged both of those convictions into the second degree murder conviction. The sentences imposed by the trial court are affirmed. This issue is without merit.

## *Cumulative Error*

Lastly, Appellant insists that cumulative errors by the trial court justify a reversal of his convictions. Because we have found no reversible error in the issues raised by Appellant, we decline to determine that cumulative errors by the trial court require a reversal of Appellant's convictions. This issue is without merit.

## *Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
JERRY L. SMITH, JUDGE